# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| THE PROCTER & GAMBLE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-940 (JJF) |
| | ) | |
| v. | ) | **CONFIDENTIAL SUBJECT TO** |
| TEVA PHARMACEUTICALS USA, INC., | ) | **PROTECTIVE ORDER** |
| | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT REPORT OF JERRY D. VOIGHT**

## I.  INTRODUCTION

I have been retained by counsel for The Procter & Gamble Company ("P&G") to provide an expert report on patent and interference practices and procedure before the United States Patent and Trademark Office (the "PTO") and to provide my expert opinions in connection with the above-referenced case involving Teva Pharmaceuticals USA ("Teva") and P&G. This expert report is provided to rebut several inaccurate assumptions contained in the Expert Opinion of George R. Lenz, Ph.D. I submit this report pursuant to Federal Rule of Civil Procedure 26(a)(2). Accordingly, I understand that I may be used at trial to present evidence under Rule 702 of the Federal Rules of Evidence.

### A.    Qualifications

I have approximately forty (40) years of experience in the patent field. I was an examiner in the U.S. Patent and Trademark Office from 1962 to 1965, and was in the private practice of patent law in Washington, D.C. from the time I was admitted to the bar in 1966 until November of 2000. Since November of 2000, I have practiced in Palo Alto, California. My practice has been varied, but has particularly emphasized interferences in the U.S. Patent and Trademark

Office (PTO). I am an author or co-author on a number of articles directed to various patent law topics, I have been an adjunct professor of patent law at George Mason University Law School, a frequent lecturer on patent law topics before various bar and continuing legal education groups, and teach a course sponsored by Patent Resources Group, Inc. on patent interference practice. In addition, I am one of only six intellectual property law attorneys in Palo Alto, CA selected by their peers for inclusion in Best Lawyers in America®. A copy of my CV is attached to this report as Exhibit A.

B.    Materials and Information Considered in Forming Opinions

Prior to preparing this report, I reviewed the following materials:

1.    U.S. Patent No. 5,583,122 to Benedict, et al. (the "Benedict patent");

2.    The prosecution history of the applications from which the Benedict patent matured, i.e., Parent Application S.N. 684,543, filed December 21, 1984 (the "'543 application"), and U.S. Patent Application S.N. 806,155, filed December 6, 1985 (the "'155 application");

3.    U.S. Patent No. 4,761,406 to Flora, et al. (the "Flora patent");

4.    U.S. Patent No. 4,687,767 to Bosies, et al. (the "Bosies patent");

5.    The Expert Report of George R. Lenz, Ph.D.;

6.    The First Amended Complaint in *The Procter & Gamble Company v. Teva Pharmaceuticals USA, Inc.,* Civil Action No. 04-940 (D. Del.);

7.    The Procter & Gamble Company's Response to Teva Pharmaceuticals U.S.A. Inc.'s First Set of Interrogatories (1-16);

8.    The Procter & Gamble Company's Response to Teva Pharmaceuticals U.S.A. Inc.'s Second Set of Interrogatories (17-18);

9.    The Procter & Gamble Company's Response to Teva Pharmaceuticals U.S.A. Inc.'s Third Set of Interrogatories (19-20);

10.    The Procter & Gamble Company's Supplemental Response to Teva Pharmaceuticals U.S.A. Inc.'s First Set of Interrogatories (1-16);

11.  The Procter & Gamble Company's Supplemental Response to Teva Pharmaceuticals U.S.A. Inc.'s First Set of Interrogatories (1-16);

12.  The Procter & Gamble Company's Supplemental Response to Teva Pharmaceuticals U.S.A. Inc.'s Third Set of Interrogatories (19-20);

13.  Defendant's Responses to Plaintiff Procter & Gamble's First Set of Interrogatories (1-11);

14.  Defendant's Supplemental Responses to Plaintiff Procter & Gamble's First Set of Interrogatories (1-11);

15.  Letter dated July 2, 2004 from Deborah A. Jaskot, Executive Director, Regulatory Affairs, Teva Pharmaceuticals U.S.A. to inter alia, Procter & Gamble Pharmaceuticals, captioned "Patent Certification Notice -- U.S. Patent Nos. 5583122, 6096342, 6165513, 5994329 and 6015801" etc., including the attached document captioned "Confidential: Teva Pharmaceuticals USA, Inc.'s Detailed Statement Of The Factual and Legal Basis For Its Opinion That U.S. Patent Nos. 5,583,122, 5,994,329, 6,015,801, 6,096,342, and 6165513 Are Invalid, Unenforceable Or Not Infringed By the Manufacture, Use Or Sale Of Teva's 5, 30 And 35 Mg Risedronate Sodium Tablets";

16.  Chisum on Patents, §§ 9.01 and 9.03[2][c];

17.  The cases cited herein;

18.  Portions of 37 C.F.R., subpart E - Interferences referred to herein (in the version that existed prior to the September 13, 2004 revision);

19.  File of Interference No. 102,399 between the Bosies patent and the '155 application;

20.  Transcript of Deposition of David Suter; and

21.  Transcript of Deposition of Kim Zerby, including Deposition Exhibits 32 and 34.

C.  <u>Compensation</u>

I am being compensated at my normal billing rate of $680.00 per hour for my work in this matter.  My compensation is not dependent upon my testimony or the outcome of this litigation.

3

D.    Previous Testimony

I provided expert testimony on behalf of Nidek Co., Ltd. in a proceeding before the United States International Trade Commission, captioned "*In the Matter of Certain Excimer Laser Systems and Vision Correction Surgery and Components Thereof and Methods for Performing Such Surgery*," Investigation No. 337-TA-419. I was also deposed in connection with that proceeding.

I was also engaged as an expert witness on behalf of Nidek Co., Ltd. in a proceeding captioned in a proceeding captioned "*In re Nidek Ecximer Laser Surgery System Patent and Antitrust MDL No. 1319 Litigation*," No. C98-04842CRB, United States District Court, Northern District of California. I was deposed, but did not testify in any trials.

I also was engaged as an expert witness on behalf Zevo Golf Company in *Zevo Golf Co. v. Karsten Manufacturing et al.*, Case No. 99-CV-2310-H (NLS), United States District Court, Southern District of California. I do not believe that this case went to trial, but I was deposed.

I also was engaged as an expert witness in another case in which I was deposed, but did not testify at trial. I can no longer further identify this case, but I recall that the subject matter was grommets and I believe the case was pending in a state court in California.

II.    **SUMMARY OF OPINIONS TO BE EXPRESSED**

I have been asked to express my opinion on patent interference practices as they relate to the issue of whether certain P&G patent claims are unpatentable on the basis of double patenting. In particular, I have been asked to rebut certain assumptions contained in the Expert Report of George R. Lenz, Ph.D., which relate to the determination of the proper test to evaluate claims 4, 11, 12, 14, 16, and 23 of the Benedict patent against claim 15 of the Flora patent for obviousness-type double patenting.

4

## III.    SUMMARY OF AN INTERFERENCE

An interference is an administrative proceeding before the Board of Patent Appeals and

Interferences at the U.S. Patent and Trademark Office ("the Board"). The Board is composed of

Administrative Patent Judges. Prior to 1999, an interference was run by a single Administrative

Patent Judge ("APJ") during the initial phases, and finally decided by a panel of three APJs.

The statutory basis for interference proceedings is established in 35 U.S.C. §135(a),

which states:

> Whenever an application is made for a patent which, in the opinion
> of the Director, would interfere with any pending application, or
> with any unexpired patent, an interference may be declared and the
> Director shall give notice of such declaration to the applicants, or
> applicant and patentee, as the case may be. The Board of Patent
> Appeals and Interferences shall determine questions of priority of
> the inventions and may determine questions of patentability. Any
> final decision, if adverse to the claim of an applicant, shall
> constitute the final refusal by the Patent and Trademark Office of
> the claims involved, and the Director may issue a patent to the
> applicant who is adjudged the prior inventor. A final judgment
> adverse to a patentee from which no appeal or other review has
> been or can be taken or had shall constitute cancellation of the
> claimed involved in the patent, and notice of such cancellation
> shall be endorsed on copies of the patent distributed after such
> cancellation by the Patent and Trademark Office.

An interference will be declared when an application claims subject matter that defines

the "same patentable invention" as the claims for another application or patent. 37 C.F.R.

§1.601(i).[1] An interference will determine which of two competing sets of claims should act as

patent-defeating prior art against the other. Since only one patent may issue for an invention, an

interference is used to determine who is *not* entitled to a patent as between, for example, two

applicants or an applicant and a patentee. To determine whether an interference exists, claims

---

[1]    While the interference rules were rewritten in September 2004 to delete 37 C.F.R.
§1.601 *et seq.*, these are the rules that applied to the Benedict '155 application and interference.

are compared to determine whether claims of an applicant anticipate or render obvious claims of

a second applicant or patentee, and vice-versa. 37 C.F.R. §1.601(n).

In declaring an interference, the APJ will determine a "Count" to define the scope of the

subject matter, i.e., the invention, in dispute. 37 C.F.R. §1.601(f). The Count should encompass

all patentable, interfering subject matter between the parties. The Count determines what proof

will be relevant to prove priority of invention. The Count also determines which claims are at

risk in the interference. Claims that "correspond to the Count" are those claims that would be

anticipated by or rendered obvious by the Count, assuming the Count to be prior art. A claim

which defines a separately patentable invention would not correspond to the Count, would not be

part of the interference, and thus would not be at risk in the interference. Interference practice

and the rules recognize that all claims in an application need not correspond to the Count. There

is no requirement in the rules to cancel claims that do not correspond to a Count and present such

claims in a separate application. To do so may create problems, such as double patenting.

## IV.    SUMMARY OF THE PROSECUTION HISTORY OF THE BENEDICT PATENT

The Benedict patent matured from a first-filed application (the '543 application, filed

December 21, 1984) and a subsequent continuation-in-part application (the '155 application,

filed December 6, 1985). The '155 application was filed before any prosecution had taken place

in the first-filed '543 application.

The first-filed '543 application did not expressly name risedronate [2-(3-pyridyl)-1-

hydroxy-ethane-1,1-diphosphonic acid], which I understand is the drug for which Teva

Pharmaceuticals USA, Inc. (Teva) seeks rights through the present action. However, it is my

understanding that it is included within the generic description of compounds encompassed by

the '543 application. The '155 application was apparently filed, at least in part, to include and

6

disclose experimental work conducted after filing of the '543 application. This application was filed prior to the one-year anniversary when foreign counterparts of an application must be filed to secure patent rights. Risedronate was specifically named in the '155 application. Subsequent to filing the '155 application, the '543 application was abandoned.

Also subsequent to filing the '543 application but prior to filing the '155 application, on June 6, 1985, an application was filed that matured into the Flora patent on August 2, 1988 (the "'976 application"). The Flora patent, like the Benedict patent, is assigned to P&G.

The Flora patent, which forms the basis for Teva's assertion of double patenting against the Benedict patent, discloses and claims a method for treating or preventing osteoporosis by administering polyphosphonates using a specific regimen of intermittent, rather than chronic (i.e., continuous) dosing. No such dosing regimen is disclosed in the Benedict patent. Moreover, the Flora patent does not disclose risedronate, although the structurally similar compound 2-(2-pyridyl)-1-hydroxy-ethane-1,1-diphosphonic acid is disclosed and recited in a dosing regimen claim.

Subsequent to the filing on December 6, 1985, prosecution of the '155 application proceeded on a substantially normal track until about July 11, 1988. By this time, P&G[2] apparently had become aware that the Bosies patent issued with claims which substantially overlapped and interfered with the claims being prosecuted in the '155 application. In accordance with the duty of disclosure, P&G disclosed this patent to the examiner responsible for the '155 application so that an interference could be conducted to determine if the Bosies

---

[2]    For simplicity, the designation "P&G" will be used herein to refer to The Procter & Gamble Company, the inventors designated on the Benedict patent, and the attorneys who prosecuted the patent. It is believed that in context it will be clear which is intended.

patent constituted prior art under 35 U.S.C. § 102(g) against the claims of the '155 application.[3] In its Amendment filed July 19, 1988, P&G first requested that an interference be declared between the '155 application and the Bosies patent. However, P&G argued that the claims including risedronate should not be included in the interference.

In due course, an interference was declared between the '155 application and the Bosies patent on May 24, 1990. It is significant to note that, upon initial declaration of the interference, all the claims in the '155 application were considered to be part of the interfering subject matter (i.e., they were designated by the PTO as corresponding to the interference Count). This was true even though the scope of the interference Count was not broad enough to encompass all of the compounds disclosed and claimed in the '155 application. For example, the interference Count did not specifically cover risedronate; however, claims directed to risedronate were designated as corresponding to the Count. This was also done contrary to P&G's specific request that certain claims not be included in the interference. In having the claims designated as corresponding to the Count, P&G recognized the risk that this created, i.e., that claims directed to risedronate were at risk in the interference because they corresponded to the Count and would become unpatentable to P&G, should P&G lose the interference. However, P&G could not rely on activity, such as conception and reduction to practice, for risedronate to establish priority in their effort to win the interference because risedronate was not included within the scope of the

---

[3] The Bosies patent claimed the benefit of the filing date of a prior German application filed on August 2, 1984, prior to the filing date of both the '155 application and the parent '543 application. Thus, if the claims in the Bosies patent were entitled to benefit of the earlier filed German priority application, the Bosies patent would constitute, subject to the outcome of a patent interference, *prima facie* prior art under 35 U.S.C. § 102(g) against the '155 application, rendering unpatentable any claims in the '155 application that were patentably indistinct from the claims in the Bosies patent. Subsequent events established that the Bosies patent was indeed § 102(g) prior art against claims in the '155 application that were directed to subject matter common to that claimed in the Bosies patent, rendering these claims unpatentable in the '155 application.

Count. As stated *supra,* the Count determines what evidence will be relevant for determining priority of invention in an interference. Because risedronate was not included within the compounds defined by the Count, P&G's inventive acts of conceiving and reducing to practice risedronate were not relevant in the interference.

Not surprisingly, in view of the risks these circumstances created, during the motion period, P&G moved (1) to designate certain claims that covered subject matter not within the interference Count as not corresponding to the interference Count, and (2) to broaden the scope of the interference Count to encompass the subject matter of all the designated claims. If the first motion were to be granted, the claims that were not within the scope of the interference Count would no longer be at risk in the interference and could be patented by P&G regardless of the outcome of the interference. If the second motion were to be granted, P&G could rely on the subject matter of these claims to establish priority in the interference. While the two motions are both logical, and the relief requested fair in each case, they are arguably inconsistent, unless viewed as alternative arguments.

Also not surprisingly, the Administrative Patent Judge (APJ) in an initial interlocutory ruling, granted one of the motions and denied the other. Specifically, the APJ granted the motion to designate the claims not within the scope of interference Count as not corresponding to the Count and denied the motion to broaden the interference Count.

The interference proceeded due course. On June 30, 1993, the Board issued a decision granting P&G priority of invention. Thus, P&G was determined to be entitled to a patent with claims directed to the subject matter of the Count. Bosies appealed the decision of the Board to the Federal Circuit. The Federal Circuit reversed the Board's decision and deemed Bosies the prior inventor of the subject matter of the Count in a decision dated May 25, 1994. *See Bosies v.*

*Benedict,* 27 F.3d 539, 30 U.S.P.Q. 2d 1862 (Fed. Cir. 1994).  As a result of the decision,

Benedict was not entitled to claims corresponding to the Count in the interference.

Subsequently, the '155 application returned to prosecution at the PTO, and claims designated as

not corresponding to the Count, *i.e.,* were outside the scope of the Count, were allowed.  The

Benedict patent thus issued on December 10, 1996, and included claims directed to *inter alia*

risedronate.

V.     **OPINIONS AND BASIS THEREFORE**

      A.     Dr. Lenz Makes Several Inaccurate Assumptions Regarding Double
           Patenting Issues

    Dr. Lenz, in his expert report, states

> I have been informed that in an obviousness-type double patenting
> analysis I am to compare to the invention of claim 15 of the Flora
> patent with the inventions of the claims of the Benedict patent and
> evaluate whether the asserted claims of the Benedict patent are
> "patentably distinct" or "obvious variations of the previously-
> issued Flora patent claims."

Expert Opinion of George R. Lenz, Ph.D., Section III. D., p. 21.

    The test that Dr. Lenz applies is clearly a "one-way" test. *In re Berg,* 140 F.3d 1428,

1432 (Fed. Cir. 1998) (double patenting exists if the application claims are obvious over the

patent claims).  Specifically, in evaluating double patenting, he merely considers whether the

relevant claims in the Benedict patent are patentably indistinct from claim 15 of the Flora patent.

He does not also determine the converse, whether claim 15 of the Flora patent is patentably

distinct from the relevant claims of the Benedict patent.[4]  Thus, he does not apply a "two-way"

test. *Id.* (double patenting exists only if the application claims are obvious over the patent claims

---

[4]     It can thus be inferred that he has declined to apply the proper test because he recognizes that the dosing regimen claims in the Flora patent are patentably distinct from the compound and method of use claims of the Benedict patent.

*and* the patent claims are obvious over the application claims). In my opinion, Mr. Lenz's

unstated reliance on the one-way test is premised on an inaccurate understanding of the

circumstances involved in the prosecution of the Benedict patent and is incorrect.

      B.     <u>A Two-Way Test Should Be Applied</u>

Chisum on Patents, § 903[2][c][iv], points out that a "two-way" rather than a "one-way"

test applies when the patent relied upon to establish double patenting was filed after, but issued

before, the patent asserted to be invalid for double patenting, *provided the delay in issuance of*

*the first-filed but second-issued patent is occasioned by proceedings in the PTO, and not*

*caused by the applicant or assignee.*[5]

As to any relevant claim in the Benedict patent found to be entitled to benefit of a filing

date of the first-filed '543 application, the Flora patent becomes the second-filed but first-issued

patent. Accordingly, if the delay in issuance of the Benedict patent was occasioned by ordinary

proceedings in the PTO and not delaying tactics by P&G, the two-way test must apply. Dr. Lenz

apparently assumes, without support or citation, that P&G engaged in delay tactics and that,

accordingly, the one-way test applies. This assumption does not comport with the circumstances

in this case and, in particular, the lengthy interference process. In my opinion, no action by P&G

resulted in any delay in issuance of the Benedict patent that should negate application of a

two-way test.

---

    [5]    The two-way test also requires that "an applicant could not have filed both sets of claims in one application." <u>In re Berg</u>, 140 F.3d at 1437. "[A]n applicant could have filed all of its claims in one application when the disclosure of the earlier filed application will support the claims in the later filed application." *Id.* at 1434 n. 5.

      1.      P&G's Filing of a Continuation-In-Part Application Does Not Demonstrate an Effort to Delay Prosecution.

In the present case, the '543 application was refiled as the '155 continuation-in-part application. I recognize that delays negating the application of the two-way test have been found based on repeated refiling of an application, thus delaying prosecution. However, the '155 continuation-in-part application was filed well before the PTO had taken any action on the '543 application. Thus, the refiling did not delay prosecution; the PTO had the opportunity to act on the '155 application as early as it acted on the '543 application. Moreover, the '155 application was filed at least in part to include data generated after filing '543 application, including the specific synthesis of risedronate. Certainly, P&G should not be penalized for submitting material, including specific identification of the drug here in issue, which could not have been presented in the first-filed case. Furthermore, I understand that the Federal Circuit has applied the two-way test even when a continuation-in-part application was filed. *General Foods Corp. v. Studiengesellschaft Kohle mbH,* 972 F.2d 1272 (Fed. Cir. 1992).

      2.      P&G's Requests for Extension Do Not Demonstrate an Effort to Delay Prosecution.

During the prosecution of the Benedict patent, counsel for P&G sought four extensions of time to file responses with the PTO (three three-month extensions and one two-month extension), and promptly paid the statutory fee for each.[6] In my opinion and experience, the fact that P&G sought (and received) these extensions of time create no inference whatsoever that P&G was attempting to delay prosecution of the Benedict patent. Each of these requests for

---

[6]     Counsel for P&G and Bosies also sought joint extensions of time during the interference to pursue settlement discussions. Certainly, there can be no suggestion that these joint requests are in any way demonstrative of a P&G effort to delay the issuance of the Benedict patent.

extension sought additional time to respond to the PTO as permitted by Rule, and each of these requests were granted *sub silentio* by the PTO. 37 C.F.R. § 1.136(a).

In my experience, such requests for extension of time are routine and are commonly sought for a variety of reasons, including to accommodate attorney workload issues and/or the need to generate substantial research or data before responding to an office action by the PTO. For example, P&G's April 21, 1989 response to the Examiner's October 21, 1988 Office Action contained and attached a significant amount of data generated by P&G. It is not surprising or in any way inappropriate that P&G sought (and received) three additional months to file this substantive response. In addition, in cases where interferences are requested, additional time to respond to Office Actions is needed to draft a request for interference and consider all the issues potentially involved in the interference as well as those raised in the Office Action. Conduct in prosecution will affect issues raised in an interference, and vice versa, and thus must be carefully considered.

In any event, the total time of these extensions was only eleven months. Given the difference of more than eight years between the issuance of the Flora patent and the issuance of the Benedict patent, even if P&G had not sought these extensions, the Benedict patent would have issued well after the Flora patent.

      3.    P&G's Involvement in an Interference Does Not Demonstrate an Effort to Delay Prosecution.

I am aware that P&G requested an interference with the Bosies patent, and, as a result of this interference, the Benedict patent only issued in 1998. However, I do not believe, for a number of reasons, that delay caused by an interference should oust a party from the benefit of a two-way test. Indeed, I am not aware of a single opinion by the Federal Circuit or its predecessor courts where delay occasioned by an interference negated application of the two-

way test. I am aware of no case in which a two-way test has been foreclosed because of delays caused by a party's adherence to appropriate or mandatory procedures; rather, it is my understanding that only delays caused by "orchestrat[ing] the rate of prosecution," such as by filing several continuation applications without responding to office actions, or by securing narrow claims while continuing to prosecute broad claims, preclude application of the two-way test. *See In re Emert*, 124 F.3d 1458, 44 U.S.P.Q. 2d 1149 (Fed. Cir. 1997) and *In re Goodman*, 11 F.3d 1046, 29 U.S.P.Q. 2d 2010 (Fed. Cir. 1993).

In the present case, if P&G had not taken steps to cause the PTO to declare an interference, two patents claiming substantially the same subject matter would be imposed upon the public, potentially subjecting possible infringers to multiple suits. An interference has the salutory effect of avoiding this improper result.

In addition, P&G had no choice but to call to the attention of the PTO the existence of the Bosies patent and the presence in that patent of claims that interfered with the claims being prosecuted in the '155 application. 37 C.F.R. § 1.56 imposes a duty upon applicants for a patent to disclose to the PTO all known information that is material to patentability. A potential interference constitutes material information that must be disclosed.

Furthermore, because the Bosies patent is entitled to the benefit of an earlier German priority application, the patent's effective filing date for priority purposes is earlier than that of the '155 application or its parent '543 application. Because in an interference, the party with the latest effective filing date bears the burden of proof to establish priority (a burden that is carried in less than 25% of interferences), the Bosies patent was *prima facie* entitled to an award of priority in an interference with the '155 application. Thus, unless P&G could sustain its burden

14

of proof to establish an earlier date of invention, any interfering claims in the '155 application would not be patentable over the Bosies patent.

It would be inconsistent with the policies underlying Patent Office practice and procedure to penalize an applicant for complying with its duty of candor and unwise to create a system that undercuts the salutory effect of both the duty of candor and interferences. It would be similarly inconsistent with those policies to penalize P&G for catching a potential mistake by the PTO. Examiners are supposed to locate interfering subject matter during examination, and institute interferences where appropriate, to prevent issuance of two patents claiming substantially the same invention. MPEP § 2300.02 (7th ed. 1998) (interferences between applications are normally initiated by the examiner, but may be requested by an applicant who has become aware of another application which may be claiming the same invention). The PTO can, and often does, institute interferences without either parties' prior knowledge and even if the parties do not want an interference declared. Had the PTO itself detected the interfering subject matter present in the Bosies patent and the '155 application, it should have declared an interference of its own volition. Under this scenario, it would be clear that P&G could not be faulted for the delay caused by the interference.

Likewise, P&G should not be penalized because it found it necessary to request an interference. Interferences are not granted by the PTO merely upon the request of a party. Rather, before an interference could be declared, the "examiner must determine that there is interfering subject matter claimed in the application and the patent which is patentable to the applicant subject to judgment in the interference." 37 C.F.R. § 1.606. Only after this determination is made does the examiner proceed by preparing a memorandum to the Board of Appeals and Interferences, explaining why he believes that the interfering subject matter is

15

present and how he believes the interference should be initially structured.  The case is then reviewed by an APJ to determine if an interference should it be declared.

Teva has suggested that P&G could have avoided the delayed issuance of the Benedict patent by simply removing the claims directed specifically to risedronate and certain other similar compounds from the '155 application and securing allowance in a continuation application.  However, this course of action was not realistically possible and, unlike the present situation, it would have presented a true double patenting problem.

First, it was not possible to insulate the risedronate and other compound claims from the interference.  Although P&G argued, prior to institution of the interference, that claims to risedronate and other similar compounds were not properly part of the interfering subject matter, in compliance with the duty of candor, it was incumbent upon P&G to allow the examiner to determine whether he thought such claims should be included in the interfering subject matter. Without an explicit determination by the Patent Office that the claims were directed to a separately patentable invention, the claims would still be subject to the interference as well as a potential double patenting rejection if presented in a continuation application.  In addition, without an explicit determination that the claims represented a different invention, there could have been a potential argument for infringement under the doctrine of equivalents of the Bosies claims by practicing Benedict's claims in view of the similarities in structures.  Furthermore, even though the Examiner indicated that the claims covering risedronate would be "allowable" in the Benedict application, that does not indicate that they would have been "allowed" if presented in a separate application since they could still have been subject to the interference with Bosies. In fact, the examiner included such claims in the initially declared interference.  Thus, prior to

instituting an interference, there was no opportunity to simply delete claims specific to risedronate from the '155 application and reassert them in a continuing application.

Moreover, once an interference is declared, jurisdiction of the interference passes to the Board of Appeals and Interferences, *ex parte* prosecution is suspended, and applicants are not permitted to continue prosecution concurrently with the interference absent approval of the APJ. 37 C.F.R. § § 1.614 and 1.615. And it is unlikely the APJ would grant permission to remove claims for prosecution in a separate application unless: (1) the claims were not included in the interfering subject matter, and (2) there was no realistic chance that the claims might ultimately be re-entered into the interference. In addition, prosecution of related applications by the same inventor(s) or assignee will often be suspended during the course of the interference, and in my opinion they would have been ill-advised to pursue this course of action. MPEP §2315.01 (7th ed. 1998)

It is my opinion that in the circumstances of the Benedict interference, an APJ would not have granted permission to remove claims for prosecution in a separate application. As noted above, P&G did file a motion requesting that claims covering risedronate and certain other closely related compounds be designated as not corresponding to the Count, and the APJ granted that motion. However, P&G also submitted a second motion that the Count be modified to include all of the originally designated claims, and the APJ denied that motion. Had the motion to designate the claims covering risedronate as not corresponding to the Count been denied, in which case the risedronate claims would have become part of the interference, then the Count would have been broad enough to encompass risedronate and thus allow P&G to establish priority of invention based upon its discovery of risedronate. Significantly, these decisions were interlocutory rulings of a single APJ, subject to review by a panel of three APJs at final hearing.

17

Based upon my experience, such interlocutory rulings were often reversed at the final hearing. If the APJ's decision had been reversed, then the risedronate claims would in fact have been included within the scope of the interference.

Moreover, a reversal of the second motion (the motion to expand the Count) at final hearing would likely result in the claims specific to risedronate being redesignated as corresponding to the Count. Thus, during the pendency of the interference, it is highly unlikely that P&G could have successfully removed the claims to risedronate from the interference.

Furthermore, had P&G been able to secure the claims ultimately obtained in the Benedict patent in a separate application either before or during the course of the interference, prevail in the interference, and then issue generic claims covering both the subject matter of the Benedict patent and the interfering subject matter, what then?[7]  Such a scenario mimics precisely the fact pattern of *Pierce v. Allen B. DuMont Laboratories, Inc.,* 297 F.2d 323 (3d Cir. 1961), a double patenting decision relied upon by Teva, and that action would have led to real double patenting between the first-issued risedronate claims and the later-issued generic claims from the interference.

Here, as set forth above, it was entirely appropriate for P&G to prosecute the risedronate claims only after the conclusion of the interference. The Benedict application returned to prosecution at the PTO and claims designated as not corresponding to the Count, *i.e.,* were outside the scope of the Count, were allowed. The Benedict patent thus issued on December 10, 1996, and included claims directed to *inter alia* risedronate.

_____

[7]     In its interference, the PTO ruled in P&G's favor. This decision was appealed by the other party, which appeal resulted in a reversal of the PTO's decision. *Boises v. Benedict,* 27 F.3d 539, 30 U.S.P.Q. 2d 1862 (Fed. Cir. 1994). This appeal further delayed issuance of the Benedict patent, but P&G can hardly be prejudiced by a delay caused by the opposing party.

In sum, it is my opinion that P&G did nothing to improperly delay in the issuance of the Benedict patent, and that the two-way test is the proper method of analyzing Teva's argument relating to double patenting. Dr. Lenz has applied the wrong test in an effort to reach the outcome desired by Teva.

## VI.     SUPPLEMENTATION OF OPINIONS

I reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or information that may be brought to my attention. I also reserve the right to adjust or supplement my analysis in light of any critique of my report or alternative opinions advanced by or on behalf of the Teva.

Dated:  February 24, 2006                        _____
                                                              Jerry D. Voight

19

# Exhibit A

**Jerry D. Voight**
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.
3300 Hillview Avenue
Palo Alto, California 94304

## Professional Highlights

- Senior counsel of one of the largest intellectual property law firms in the U.S.  Have served three terms as a member of the firm's Management Committee and was Managing Partner of the firm's Palo Alto office for five years.

- Approximately 40 years experience in all aspects of patent law practice, including infringement litigation and patent interferences.  Reported cases in which a meaningful role was played include:

  Singer v. Rehfuss, 1998 59 U.S.P.Q. 2d 1190 (Bd. Pat. App. & Inter. 1998).

  Eastman Kodak Co. v. The Goodyear Tire & Rubber Co., 114 F.3d 1547 (Fed. Cir. 1997).

  Reitz v. Inoue, 39 U.S.P.Q.2d 1838 (Bd. Pat. App. & Inter. 1995).

  ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576 (Fed. Cir. 1988).

  ZMI Corp. v. Cardiac Resuscitator Corp., 11 U.S.P.Q.2d 1634 (D. Or. 1989).

  ZMI Corp. v. Cardiac Resuscitator Corp., 15 U.S.P.Q.2d 1398 (Fed. Cir. 1990) (non-precedential).

  Hoechst AG v. Quigg, 917 F.2d 522 (Fed. Cir. 1990).

  Martin v. Mayer, 823 F.2d 500 (Fed. Cir. 1987).

  Special Metals Corp. v. Teledyne Industries, Inc., 717 F.2d 128 (4th Cir. 1983).

  Weil v. Fritz, 503 F.2d 562 (CCPA 1974), 572 F.2d 856 (CCPA 1978), and 601 F.2d 551 (CCPA 1979).

  Case v. The Goodyear Tire & Rubber Co., 223 U.S.P.Q. 120 (D. Mass. 1983).

  Winter v. Banno, 229 U.S.P.Q. 212 (Bd. Pat. App. & Inter. 1985).

  Jacobs v. Moriarity, 6 U.S.P.Q.2d 1799 (Bd. Pat. App. & Inter. 1988).

- Selected by peers for inclusion in Best Lawyers in America® (one of only six IP lawyers in Palo Alto, CA)

- Instructor and co-author of course book, "Patent Interference Practice," Patent Resources Group, Inc., 1995 - Present.

- Adjunct professor of patent law at the George Mason University Law School, 1989-1991.

- Frequent lecturer on patent law topics before various bar and continuing legal education groups.

- Admitted to Practice:

> U.S. Patent and Trademark Office (1966)
> District of Columbia (1966)
> U.S. Court of Appeals for the Federal Circuit (1982)
> U.S. Supreme Court (1969)

## Professional Activities

- District of Columbia Bar (Member, Unauthorized Practice Committee, 1986-91).

- Bar Association of the District of Columbia (Chairman, Patent, Trademark & Copyright Section, 1980-81).

- American Intellectual Property Law Association.

- American Bar Association, Patent, Trademark & Copyright Law Section (Chairman, Ethics Committee, 1982-85, 1987-88; Chairman, Inequitable Conduct & Antitrust Matters Committee, 1985-87; Chairman, CLE Committee, 1989-90; Counsel, 1990-95; Chairman, Special Committee on Interferences, 1996 - 2000).

## List of Publications (author or co-author)

"Arguing Before the Board of Patent Appeals and Interferences: Strategies for Success," IP Litigator, September/October 2003.

"The U.S. Patent Interference: A Proceeding of Growing Interest to Multinational Companies," Managing Intellectual Property, March & April, 1996.

"Patent Interferences in the United States," 36 Patent Management 835, 1987.

"The Scope of Discovery in Patent Interferences," 62 J.P.O.S. 160 and 62 J.P.O.S. 188, March & April, 1980.

"Patent Litigation in Chemical & Biotechnology Cases," Patent Resources Group Course Book, 1988.

"Declaratory Judgment Actions in Patent Cases Where There Has Been No Act of Infringement," 72 J.P.O.S. 1136, December, 1990.

"Legal Principles Governing Patent Infringement in the U.S.," 37 Patent Management 433, 555, 1987.

"The New Patent and Trademark Office Disciplinary Rules - Some Views from the Bar," 67 J.P.O.S. 162, April, 1985.

"The Nine No-No's, A More Favorable Climate for Technology Transfer or a Trap for the Unwary?", Licensing Law and Business Report, Sept.-Oct., 1983.

"Lear v. Adkins: After Nine Years Have The Questions It Raised Been Answered?", Licensing Law & Business Report, Aug.-Sept., 1978.

## Employment History

- 1972-Present:  Associate and partner (since 1974) in the intellectual property law firm of Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.

- 1965-1972:  Associate and partner in the Washington, D.C. patent law firm of Irons and Sears (and predecessors).

- 1962-1965:  Examiner, U.S. Patent and Trademark Office.

## Education

- Juris Doctor (with honors) from the George Washington University Law School (1965).

- B.S. in Chemical Engineering from Montana State University (1959).

#372527 PA

# EXHIBIT B

LEXSEE 1997 DIST. LEXIS 4117

**REVLON CONSUMER PRODUCTS CORPORATION, Plaintiff, v. L'OREAL S.A., COSMAIR, INC., MAYBELLINE, INC., and MAYBELLINE SALES, INC., Defendants.**

**Civil Action No. 96–192 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1997 U.S. Dist. LEXIS 4117*

**March 26, 1997, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**COUNSEL:** Jack Blumenfeld, Esq., and Jon E. Abramczyk, Esq., of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Daniel J. Leffell, Esq., Elizabeth J. Holland, Esq., and Douglas A. Berman, Esq., of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York; and John W. Behringer, Esq., of Fitzpatrick, Cella, Harper & Scinto; attorneys for plaintiff.

Rudolph E. Hutz, Esq., and Stanley C. Macel, III, Esq., of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Of Counsel: Norman H. Stepno, Esq., Frederick G. Michaud, Jr., David M. Schlitz, Esq., and Ronni S. Jillions, Esq., of Burns, Doane, Swecker & Mathis, L.L.P., Alexandria, Virginia; and Norman F. Oblon, Esq., Richard D. Kelly, Esq., Jean–Paul Lavalleye, Esq., and Frank J. West, Esq., of Oblon, Spivak, McClelland, Maier & Neustadt, P.C., Arlington, Virginia; attorneys for defendants.

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINIONBY:** Murray M. Schwartz

**OPINION:**

## MEMORANDUM OPINION

Submitted on Briefs
Dated: March 26, 1997
Wilmington, Delaware

Schwartz,        Senior        District
JudgeINTRODUCTIONRevlon        Consumer
Products Corp. ("Revlon") filed this lawsuit against [*2] L'Oreal S.A., Cosmair Inc., Cosmair Canada, Inc., n1 Maybelline, Inc. and Maybelline Sales, Inc. (collectively "defendants") alleging infringement of Revlon's patented composition for transfer resistant lipstick. See Docket Item ("D.I.") 61 (Amended Complaint). Three defendants, Cosmair Inc., Maybelline Inc., and Maybelline Sales Inc., asserted a counterclaim seeking a declaratory judgment that Revlon's patent is invalid and they have not infringed nor induced infringement.

   n1 Cosmair Canada, Inc. has since been dismissed as a defendant. D.I. 24.

Before the Court is Revlon's motion to preclude the testimony of defendants' patent law expert, John Witherspoon. D.I. 147. According to his report, Mr. Witherspoon proposes to offer opinions on a wide range of issues, including Patent and Trademark Office ("PTO") practice and procedure as well as many substantive areas of patent law. n2 Id., Exh. A at 2. The parties agree Mr. Witherspoon may testify as to PTO practice and procedure. D.I. 154, at 1; D.I. 157 [*3]  at 2. Revlon asserts, however, the remainder of Mr. Witherspoon's proposed testimony goes to topics inappropriate for expert testimony in a patent case. D.I. 157, at 2. In their answer to Revlon's motion, defendants indicate other than PTO practice and procedure, they wish only to introduce Mr. Witherspoon's testimony on the issue of inequitable conduct. D.I. 154, at 1. Thus, to resolve Revlon's motion, the Court must decide whether to admit testimony by a proffered patent law expert on the topic of inequitable conduct.

   n2 Specifically, these areas are: "patent infringement, both literal and under the doctrine of equivalents; principles of claim construction and interpretation; prosecution history estoppel; conditions for patentability, including novelty, utility and nonobviousness under *35 U.S.C. §§ 101,* 102 and 103; requirements for and purposes of patent specifications and claims under *35 U.S.C. § 112;* the prohibition regarding the addition of new matter under *35 U.S.C. § 132;* duties and responsibilities of an inventor, his or her attorney or agent, and others

substantively involved in the preparation and prosecution of a patent application in the PTO; and the prosecution history of the patent in suit." D.I. 147, Exh. A, at 2.

[*4] DISCUSSION

**I. Inequitable Conduct**Inequitable conduct has been defined by the Federal Circuit Court of Appeals as "an 'affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.'" *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 103 F.3d 1538, 1549 (Fed Cir. 1997)* (citation omitted); accord *Refac International, Ltd. v. Lotus Development Corp., 81 F.3d 1576 (Fed Cir. 1996).* "Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Refac International, 81 F.3d at 1581.*The proponent of a claim of inequitable conduct must prove "the threshold elements of materiality and intent by clear and convincing evidence." *Micro Chemical, Inc., 103 F.3d at 1549.* "The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether they warrant a conclusion that inequitable conduct occurred." Id. "A determination of inequitable [*5] conduct is committed to a district court's discretion." Id.

**II. Expert Testimony**Defendants assert Mr. Witherspoon's testimony as to inequitable conduct may assist the trier of fact and thus is admissible under *Federal Rule of Evidence 702.* That rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Fed. R. Evid. 702.*Because the admission of expert testimony is a "procedural matter" not unique to patent issues, the law of the Third Circuit Court of Appeals governs this motion, as opposed to the law of the Federal Circuit. *Panduit Corp. v. All States Plastic Manufacturing Co., 744 F.2d 1564, 1574–75 (Fed. Cir. 1984);* accord *National Presto Industries, Inc. v. The West Bend Co., 76 F.3d 1185, 1188 n.2 (Fed. Cir. 1996).*The decision whether to admit expert testimony is committed to the discretion of the district court. *United States v. Velasquez, 33 V.I. 265, 64 F.3d 844, 847–48 (3d Cir. [*6] 1995).* As might be

gleaned from the rule, several bases exist for excluding expert testimony. They are: "(1) if the testimony will not assist the trier of fact; (2) if scientific [or technical or other specialized] evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1238 (3d Cir. 1993);* see also *Holbrook v. Lykes Bros. Steamship Co., Inc., 80 F.3d 777, 781 (3d Cir. 1996).*The Third Circuit Court of Appeals has adopted a broad interpretation of Rule 702; close calls on the admission of expert testimony are to be resolved in favor of admissibility. *Dunn v. Hovic, 28 V.I. 526, 1 F.3d 1362, 1367 (3d Cir. 1993).* However, "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury ...." *United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991).* As relevant to Revlon's motion, Mr. Witherspoon's testimony will be inadmissible either if it is not helpful to the trier of fact, or if it constitutes impermissible testimony before the jury [*7] as to the governing law.Defendants have not provided the details of Mr. Witherspoon's proposed testimony on inequitable conduct, beyond the sentence: "Defendants request that Mr. Witherspoon be allowed to testify as to the inequitable conduct issue if the Court determines that Mr. Witherspoon's testimony as a legal expert would assist in its determination." D.I. 154, at 2. Defendants' answer to Revlon's motion places into issue the currently unsettled question of whether, in this case, the judge or the jury will act as fact–finder on the issue of inequitable conduct.With respect to that question, the Federal Circuit recently explained:

> There are a variety of ways in which the district court may choose to handle the issue of inequitable conduct during a jury trial ... Some courts have reserved the entire issue of inequitable conduct unto themselves; some have submitted special interrogatories to the jury on the facts of materiality and intent; and some have instructed the jury to find and weigh the facts of materiality and intent and decide the ultimate question of inequitable conduct ... Absent a clear showing of prejudice, or failure to achieve a fair trial, the district [*8] court's choice of procedure will not be disturbed.

*Hebert v. Lisle Corp., 99 F.3d 1109, 1114 (Fed. Cir. 1996).* The court noted in the last instance the parties agreed to submit the entire issue of inequitable conduct to the jury. Id.Failing to achieve similar agreement of the parties in the present case, the Court will opt to submit

1997 U.S. Dist. LEXIS 4117, *8

to the jury special interrogatories on the facts of materiality and intent. The Court will then weigh the findings on these two elements "in light of all the circumstances," and decide the ultimate question of inequitable conduct. See *Micro Chemical, Inc., 103 F.3d at 1549;* see also *Akzo N.V. v. U.S. International Trade Commission, 808 F.2d 1471, 1481–82 (Fed. Cir. 1986)* ("Materiality and intent must ... be considered together: the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct.")As the determination of the Court consists of a 'weighing' of the factual findings on materiality and intent, and then a determination in light of all the circumstances whether inequitable conduct occurred, see *Micro Chemical, Inc., 103 F.3d at 1549,* it follows that [*9] the jury will act as the sole fact-finder on the issue of inequitable conduct. The Court therefore cannot permit Mr. Witherspoon to testify as an expert on inequitable conduct; to do otherwise would usurp the respective functions of the jury and the Court. n3

> n3 The Federal Circuit recently noted one of the hazards of permitting expert testimony on patent law:
>
>> We take note of the extent to which . . . incorrect law was announced by a patent law expert witness. We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts . . . markedly incorrect law.
>
> *Hebert, 99 F.3d at 1117.*

In accordance with the other cases in this District, the Court holds defendants' expert John Witherspoon may testify only as to matters of PTO practice and procedure. See Lucas Aerospace, Ltd. v. Unison Industries, L.P., No. 93–525 (D. Del. March, 9, 1995); General Battery Corp. v. Gould, Inc., 545 F. Supp. 731, 758 n.30 (D. Del. 1982); see also Thorn EMI North [*10] America Inc. v. Micron Technology, Inc. No. 92–673 (D. Del. Nov. 23, 1993) (McKelvie, J.) (hearing transcript); The Read Corporation v. Portec, Inc., No. 88–29 (D. Del. March 9, 1990) (Roth, J.) (hearing transcript); RCA Corp. v. Data General Corp., No. 84–270 (D. Del. Dec. 17, 1986) (Farnan, J.) (hearing transcript); Guidelines: Legal Expert Testimony in Patent Cases (Robinson, J.). n4 Mr. Witherspoon may not testify as to substantive issues of patent law, including inequitable conduct. For purposes of clarity, it is noted this holding precludes, among other things, Mr. Witherspoon's proposed testimony regarding the "duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO ...." D.I. 147, Exh. A, at 2.

> n4 While this rule regarding patent experts is followed in this District, it is not uniform throughout the country. Several Federal Circuit cases refer, in passing, to expert testimony that was permitted on the topic of inequitable conduct, see *Hebert, 99 F.3d at 1115; Kingsdown Medical Consultants Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988).*

[*11] An order will issue consistent with this opinion.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 JUL 16  PH 4: 29

MKS INSTRUMENTS INC. and        :
APPLIED SCIENCE AND TECHNOLOGY, :
INC.                            :
                                :
          Plaintiffs,           :
                                :
     v.                         :  Civil Action No. 03-469 JJF
                                :
ADVANCED ENERGY INDUSTRIES, INC.,:
                                :
          Defendant.            :

## ORDER ON MOTIONS IN LIMINE

Presently before me are MKS's Motions in Limine (D.I. 198). I have reached the following decisions regarding these motions:

Motion #1    -    **DENIED.** The Court has clarified the claim construction provided in the first trial not changed it by its Memorandum Opinion and Order dated February 12, 2004 (D.I. 83, 84). This Order controls the testimony on infringement in this case.

Motion #2    -    **DENIED.** (see Motion #1 above)

Motion #3    -    **DENIED.** Advanced represents it will not offer "design-around" evidence and therefore, any evidence of the infringing RAPID product is irrelevant or excludable under Rule 403.

Motion #4    -    **DENIED as moot.**

Motion #5    —    DENIED as moot.

Motion #6    —    DENIED as moot.

Motion #7    —    DENIED.  The Court will
consider any alleged violations of expert discovery
obligations  during  the  by  post-trial  motions
practice.

Motion #8    —    DENIED.  However, objections to
the offer of cumulative testimony may be made at
trial.    The  Court  will,  at  the  time  of  an
objection, determine if the question objected to
seeks testimony that under the rules of evidence is
cumulative.

Motion #9    —    DENIED as moot.

Motion #10    —    GRANTED.  In this district,
expert  testimony  on  U.S.  Patent  and  Trademark
Office  ("PTO")  procedures  and  patent  law  are
excluded.  Depending on a proffer, expert testimony
on  PTO  procedure  regarding  the  specific  matter
before  the  Court  may  be  accepted  on  inequitable
conduct issues (bench trial).

Motion #11    —    GRANTED.

Motion #12    —    GRANTED.

Motion #13    —    DENIED.

Motion #14    —    DENIED.

Motion #15    -    **DENIED**.


IT IS SO ORDERED.


July 16, 2004
DATE

UNITED STATES DISTRICT JUDGE

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



LUCAS AEROSPACE, LTD.,          :
                                :
            Plaintiff and       :
            Counter Defendant,  :
                                :
    v.                          :    Civil Action No. 93-525-JJF
                                :
UNISON INDUSTRIES, L.P.,        :
                                :
            Defendant and       :
            Counter Claimant.   :

## O R D E R

WHEREAS, Defendant Unison Industries, L.P. ("Unison") filed Motion in Limine No. 2 to Limit the Testimony by Plaintiff's Patent Law Expert A. Donald Messenheimer (D.I. 269);

WHEREAS, Unison contends that Mr. Messenheimer as a patent law expert should not be permitted to give opinions on the issues of law or the legal significance of the facts;

WHEREAS, Lucas Aerospace, Ltd. ("Lucas"), by way of response contends that Mr. Messenheimer's testimony will provide the jury and the Court with the benefit of his specialized knowledge regarding the practice of obtaining a patent and the procedures followed in the application which resulted in the patents at issue;

WHEREAS, Lucas further contends that any objections to particular questions are more appropriately raised during the course of trial at the time Mr. Messenheimer's testimony is elicited before the jury;

WHEREAS, the Court finds that Mr. Messenheimer is offered as a witness on practice and procedure in the Patent and Trademark Office as indicated by Lucas in their briefing;

WHEREAS, the Court finds that "patent law experts" are permitted to testify about Patent Office practice and procedure but not to draw inferences or make statements or conclusions about the patent law of the case;

NOW THEREFORE, IT IS HEREBY ORDERED this ___9___ day of March, 1995, that Unison's Motion in Limine No. 2 to Limit the Testimony by Plaintiff's Patent Law Expert A. Donald Messenheimer is GRANTED, and Mr. Messenheimer is limited to factual recitations concerning practice and procedure in the Patent and Trademark Office.

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT E

LEXSEE 1996 U.S. DIST. LEXIS 9221

VISKASE CORPORATION, Plaintiff, v. AMERICAN NATIONAL CAN COMPANY, Defendant.

Case No. 93 C 7651

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1996 U.S. Dist. LEXIS 9221*

**July 1, 1996, Decided**
**July 1, 1996, FILED, DOCKETED**

**COUNSEL:** [*1] For VISKASE CORPORATION, plaintiff: Roy E. Hofer, William H. Frankel, Robert W. Stevenson, Allan J. Sternstein, Andrew D. Stover, Brinks, Hofer, Gilson & Lione, Chicago, IL.

For AMERICAN NATIONAL CAN COMPANY, defendant: Jeffrey D. Colman, Jenner & Block, Chicago, IL. Harry J. Roper, Steven Raymond Trybus, Sarah Lynn Taylor, Roper & Quigg, Chicago, IL. Douglas W. Wyatt, Thomas A. O'Rourke, Wyatt, Gerber, Burke & Badie, New York, NY.

**JUDGES:** Elaine E. Bucklo, United States District Judge

**OPINIONBY:** Elaine E. Bucklo

**OPINION:**

MEMORANDUM OPINION AND ORDER Viskase's motion in limine (No. 1) to preclude ANC from referring to patent marking of method or process claims in Viskase's patents in suit is granted. I have reviewed the cases relied upon by ANC and conclude that they are limited to the situation in which the same patent covers both a product and a method. Viskase's motion in limine (No. 2) to preclude patent attorney R. Franklin Burnett from giving testimony about what a person having ordinary skill in the art would find obvious is granted. Mr. Burnett is not a person skilled in the relevant art. To put the question the other way illustrates the problems in ANC's proposed testimony: [*2] no one would agree that a former patent examiner could testify that a person having ordinary skill in the art would find that the claimed advance or new technology was not obvious in the face of evidence that someone practicing in the field was actually practicing the technology in question at the relevant time. Neither is he competent to testify to the converse. Viskase's motion in limine (No. 3) to exclude all references to Mr. Burnett's prior employment by Willian Brinks Hofer, *et al.,* if not mooted by my ruling above, is granted. Whether Mr. Burnett has expertise in some area would not be helpful in deciding the specific questions at issue here. Any such references undoubtedly would lead to time spent on issues that are irrelevant to the issues to be decided. Viskase's motion in limine (No. 4) to preclude William D. O'Connell from testifying about ANC's lost profits as a basis of Viskase's lost profits is granted. While it is true that the court in *Kori Corp. v. Wilco Marsh Buggies & Draglines, 761 F.2d 649, 655 (Fed. Cir. 1985), cert. denied, 474 U.S. 902, 88 L. Ed. 2d 229, 106 S. Ct. 230 (1985),* held that evidence of an infringer's profits could be useful for comparison [*3] purposes, ANC does not propose to use its profits for that purpose in this case. Furthermore, the district court has discretion in determining a method for calculating damages. *Id. at 654.* Particularly when a jury is to make the determination, the danger that it would use the figures improperly outweighs any potential usefulness. Viskase's motion in limine (No. 5) to preclude ANC from calling John M. Dely and nine Dow witnesses to testify as expert witnesses is granted in part. ANC stated at the hearing on March 21, 1996, that it could present its case through four experts. The Supreme Court has now decided the *Markman* case and in view of its decision, I have decided to hold a separate evidentiary hearing on the Markman issues. Although, as discussed below, I do not think ANC has shown any justification for not naming any of these people as witnesses at the proper time, I do not think Viskase will be prejudiced if some of the witnesses testify in the hearing before me on the *Markman* issues. Accordingly, I will allow ANC to present up to three technical experts at that hearing. If there remain issues about which any technical experts' testimony would be relevant following [*4] that hearing, further consideration will be given to ANC's request and Viskase's motion. Viskase's motion in limine (No. 6) to

1996 U.S. Dist. LEXIS 9221, *4

exclude Dow documents and motion in limine (No. 7) to exclude tests that were not produced until after discovery closed are granted. ANC has not shown sufficient reason for not producing the documents or doing the testing before discovery closed and additional discovery at this point would delay and lengthen the trial. ANC's argument that it would not have had access to the Dow documents earlier is not believable. In the first place ANC could have subpoenaed any documents it could not get through voluntary cooperation from Dow. At any rate, Dow appeared with ANC at numerous pretrial conferences and they clearly were in a cooperative relationship. ANC says it, or Dow, decided that Dow should not voluntarily provide cooperation while its motion to intervene was pending, and that I did not decide the motion until after discovery closed. In the first place, however, I had denied, in December, 1994, Dow's motion to consolidate the separate action it had brought in this district. Dow could have had no realistic belief that if I would not it to consolidate the other [*5] action that I was likely to allow it to intervene in this action. Second, the motion to intervene was not brought until January 31, 1995. Dow did not file its reply brief in support of the motion until March 2, 1995. ANC knew that discovery was scheduled to close March 9, 1995 (extended at some point to May 9, 1995), and that its expert reports were due May 8, 1995. It never sought an extension of discovery on the basis that it could not get cooperation from Dow until after I decided the motion to intervene.Viskase's motion in limine (No. 8) to preclude ANC from introducing or referring to (1) Dow mathematical models used to predict polymer synthesis or (2) Dow catalysts or process parameters for making PL1840 is granted in part. ANC represents that it does not have and does not intend to use any mathematical models to predict polymer synthesis. Accordingly, the motion is granted without objection. The second part of Viskase's motion is denied. Viskase has not shown that it sought discovery on this issue. It therefore has no basis for exclusion.Viskase's motion in limine (No. 9) to exclude documents 89072–182J and 89194–209 because they were not produced until after discovery closed [*6] is granted. ANC has not shown a sufficient reason for not producing the documents and its argument that it "missed" the documents is not credible.Viskase's motion in limine (No. 10) to preclude ANC from introducing or

relying upon a *35 U.S.C. § 135*(b) defense is granted. That section does not give ANC substantive rights. *In re Sasse, 629 F.2d 675 (C.C.P.A. 1980).*Viskase's motion in limine (No. 11) to exclude United States Patent No. *4,547,433* because it was not produced or identified by ANC until after discovery closed is denied. It is undisputed that the patent was in Viskase's possession, and produced to ANC, during discovery.ANC's motion in limine to preclude Viskase from introducing at trial evidence of damages prior to January, 1994 is granted as to U.S. patent No. *5,256,428.* It is denied as to process patents for the reasons stated above. As to other product patents on which Viskase marked the containers but not the product itself, I am unable to make this determination on this record.ANC's motion in limine to preclude the expert testimony of Paul J. Duggan concerning the issue of patent royalties is denied. ANC has not cited any case saying that defendant's profits [*7] cannot be considered in determining a reasonable royalty rate.ANC's motion in limine to preclude Viskase's introduction at trial of certain evidence relating to double bubble process is denied. So far as is shown by the record before me (which is limited to an excerpt from the prosecution history), Viskase distinguished its double bubble process from a cold drawn process. Since the claims in none of the Viskase patents, however, rely on a particular double bubble process under such circumstances it would not be limited to the specific process described in the Pahlke patent.With regard to the *Markman* hearing referred to above, it seems to me that the length of the jury trial may well be shortened significantly by having an earlier *Markman* hearing. Accordingly, and to enable me to realistically schedule the amount of time needed for trial, the *Markman* hearing is set for August 7, 1996 at 9:30 a.m. I expect all testimony that any party would present at trial on the issues on which I will be expected to rule under *Markman* to be given at that hearing. I have scheduled one week for the hearing. If any party believes that will be an insufficient amount of time I must be [*8] notified in writing by July 11, 1996. I will be unable to entertain any motion for a continuance to another date for the hearing due to other trials.ENTER ORDER:Elaine E. BuckloUnited States District Judge

Dated: July 1, 1996

LEXSEE 1996 U.S. APP. LEXIS 24242

**VISKASE CORPORATION, Plaintiff-Appellee, v. THE DOW CHEMICAL COMPANY, Defendant–Appellant, and AMERICAN NATIONAL CAN COMPANY, Defendant.**

No. 96–1131

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*1996 U.S. App. LEXIS 24242*

**August 30, 1996, Decided**
**August 30, 1996, FILED**

**NOTICE:** [*1] RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *98 F.3d 1356, 1996 U.S. App. LEXIS 41337.*

**PRIOR HISTORY:** Appeal From A Judgment Of The United States District Court For The Northern District Of Illinois In 93–CV–7651 Entered August 31, 1995, And November 3, 1995, Judge Elaine E. Bucklo.

**OPINION:**

**[PROPOSED] ORDER OF THE COURT** The parties having so agreed, it is ORDERED that the proceeding is DISMISSED under Fed. R. App. P. 42 (b), with each party to bear its own costs. Viskase having withdrawn its Motion For Sanctions, it is furthered ORDERED that Plaintiff-Appellee Viskase's Motion For Sanctions Under Rule 38, Fed. R. App. P. is DISMISSED as moot. Date 8/30/96

ISSUED AS A MANDATE: August 30, 1996